People of State of Illinois, Plaintiff-Appellee, v. One Mechanical Device or Machine Designated as Bally Dude Ranch, Serial No. C–2603, and More Commonly Called a Pinball Machine, and Elmer C. Hallgren et al., d/b/a H & H Music Company, and Kenneth Taylor, Defendants-Appellants.

Gen. No. 10,864.

Second District.

January 31, 1956.

Rehearing denied February 14, 1956.

Released for publication March 9, 1956.

Francis J. Coyle, Sam M. Arndt, and Crowley, Sprecher & Weeks, all of Rock Island, for defendants-appellants.

Bernard J. Moran, State's Attorney, Rock Island County, of Rock Island, for plaintiff-appellee; Henry W. McNeal, of Rock Island, of counsel.

JUSTICE CROW delivered the opinion of the court.

On July 9, 1954 the State's Attorney for Rock Island County petitioned the Circuit Court requesting an order directing him to destroy a certain pinball machine. The petition stated that the machine had been seized by a police officer and turned over to the State's Attorney, and that it was a device upon which money is staked, hazarded, bet, won, or lost, and was manufactured and made for the purpose of gambling uses and had no other lawful purpose, and was subject to seizure and destruction as the law provides for gambling devices.

Subsequent to the filing of the petition certain persons moved to intervene, which motion was allowed and they were made parties defendant. After preliminary proceedings, not involved in this appeal, they filed their answer denying that the machine was a gambling device. After a hearing before the Court, with both sides presenting evidence, which included a demonstration of the machine in operation, the Court entered an order on March 2, 1955 adjudging that the pinball machine was a gambling device, subject to seizure, and ordered its destruction.

The proceeding was brought under Sec. 2 of what is popularly known as the Gambling Device statute (Ch. 38, Ill. Rev. Stats. 1953, pars. 341-343 [Jones Ill. Stats. Ann. 37.271-37.273]), and the sole question presented is whether a pinball machine of this type is subject to the proscriptions of that statute.

That Act, originally passed in 1895, consists of three sections. Section 1 (Par. 341) provides penalties for persons who operate, keep, own, rent, or use, inter alia, slot machines or any other device upon which money is staked or hazarded, or into which money is paid or played upon chance, or upon the result of the action of which money or other valuable thing is staked, bet, hazarded, won or lost. Section 2 (Par. 342) declares such machines to be gambling devices and authorizes

40

the seizure, confiscation, and destruction of such machines and devices by duly constituted authorities. Section 3 (Par. 343) provides for penalties as against various named types of people who have to do with the premises where the gambling devices are located or have to do with the devices themselves. This statute remained unchanged from its enactment until July 7, 1953, when Pars. 341 and 342 were amended, and, as so amended, the statute was in effect at the time material hereto and is now in effect in its original form, subject only to the 1953 amendment.

Construing the statute prior to the 1953 amendment, we held in People v. One Pinball Machine, owned by Henry Fox (1942) 316 Ill. App. 161, that a pinball machine, similar in most essential respects to the one here ordered destroyed, was a gambling device, fell within the ban of the statute, and was subject to destruction. That was in 1942. The amendment of 1953, however, calls for a re-examination of the problem.

This amendment to both Sections 1 and 2 (Pars. 341 and 342) adds the following to the original provisions, previously summarized:

"A coin-in-the-slot-operated mechanical device played for amusement which rewards the player with the right to replay such mechanical device, which device is so constructed or devised as to make such result of the operation thereof depend in part upon the skill of the player and which returns to the player thereof no coins, tokens or merchandise shall not be considered to be a gambling device within the meaning of this Act and any right of replay so obtained shall not represent a valuable thing within the meaning of this Act."

In People v. One Pinball Machine, supra, where the cases and authorities were extensively reviewed, we based our affirmance of the destruction order on the fact that the free play feature represented "a valuable thing," and since the device in question there had the

41

requisite mechanical features defined in the statute and its operation depended upon chance all aspects of the then statute were satisfied to justify seizure and destruction. We are called upon to determine now whether or not the instant device satisfies in all respects the statute as amended in 1953, which was the basis of the present destruction order. The parties have not referred us to an Illinois case directly in point arising since the amendment, and we know of none. City of Chicago v. Wickey (1954) 4 Ill.2d 423, referred to by the defendants, involved a new tax statute of 1953 by which the State imposed a privilege tax upon certain coin-operated devices (Ch. 120, Ill. Rev. Stats., 1953, par. 481 b.1–481 b.12 [Jones Ill. Stats. Ann. 119.973(1)–119.973(12)]), and a city ordinance prohibiting certain pinball games, and held that the 1953 Act did not by implication repeal a section of the Cities and Villages Act authorizing a city to prohibit such games; it apparently was undisputed in that case that the device fell within one of the types described by the 1953 Act (though which type is not set forth) and also fell within the city ordinance, the facts had been stipulated,—and the only question was the legal question of whether there was or was not a repeal by implication; the details of the operation of the device are not set forth therein; in the instant case the question involved is not the same, the facts are disputed, there is no stipulation, and the details of the operation of this device are fully gone into in the evidence as we shall hereinafter set forth.

This particular machine bears the identifying name of Bally Dude Ranch and is manufactured and/or sold by the Bally Manufacturing Company of Chicago, Illinois. It is apparent from a reading of the record and viewing its actual operation in this Court, a demonstration having also been had before us, that it has the usual features beguilingly present in most pinball machines, though this one seems to be more ingeniously

42

constructed than most. It is mounted on four legs, stands about three and one-half feet high, and has an inclined horizontal playing field, dotted with numerous pegs, bumpers, rubber rings, spring bumpers, lights, and twenty-five numbered holes, all artistically decorated, and attractive. This, of course, is all under glass. A vertical score board or back plate or glass rises at the inclined rear end above the playing field. On this back plate or glass are three squares with numbers in them. The square to the left contains a series of numbers, twenty-five in all, corresponding to the numbered holes on the playing field. In this square there are five rows of five numbers each and it is designated as the First Card. Upon depositing a single dime this card lights up. The square on the right of the vertical score board is the Second Card and it is like the First Card. The Second Card lights up after depositing a second dime and gives the player twice the opportunity to score free games, which free games accord the player the right to replay without charge. Also on the vertical score board is a square in the center with nine numbers in three rows of three each and it is called the Super Card. The Super Card works on the same idea as the First Card, except that three-in-a-row on it scores as many free games as four-in-a-row on the First Card, and if the four corner numbers on the Super Card are lit a larger number of free games is won. At the left top of the vertical score board is another square called "First and Second Card Corners Score 200," and, when this is lighted by depositing a dime, then lighting the four corner numbers of the First or Second Card wins 200 games, but it is possible this First and Second Card Corners square will not light up when a dime is deposited,—the player having no control over that circumstance.

At the front, or player's end of the device, on the right is a rubber tipped steel plunger mounted in a spring, with a knob on the end, so that by pulling it

43

back and releasing it, it acts as a catapult. Below the plunger is a "ball guide plate" scored with several lines on which a player can measure how far out he pulls the plunger. One of the defendants' witnesses says the design of the knob of the plunger is meant to give a player the maximum amount of "sensitivity" in gauging his shot. The dime deposited not only lights the First Card but releases five steel balls, the first of which immediately appears in a channel in front of the plunger. Releasing the plunger catapults the ball through a channel running approximately the length of the machine to the top end of the playing field. The ball comes out of the channel onto the playing field at a point at the rear, farthest from the player, then immediately rolls by force of gravity down the field, being deflected erratically and unpredictably in its downward course by the various impediments already described, until it either comes to rest in one of the numbered holes, or into a free ball hole, or drops out of play without scoring. If the ball goes in a given numbered hole an electrical contact is made causing a corresponding number, or numbers, on the vertical score board to light up. So far as the First Card is concerned the player hopes to light up the numbers in the card consecutively, either three or four or five in a line, diagonally, vertically, or horizontally, and, if so, a winner is scored, much as in the game of Bingo. If two dimes are played the Second Card illuminates and the purpose is the same as with the First Card. The other cards operate on the same general principle. The object of the various combinations, plus innumerable added features, is to increase one's chances to win free games, and these are scored by a computing device in a little windowed square to the top right of the vertical score board. Thus the player knows, at any given time, the total number of free games to his credit, if any.

The game features are innumerable, and are cleverly designed. One way, for example, by depositing dime

44

after dime and/or pressing various buttons, at a certain point in the game select certain features by which if he thereafter lights less than the usual amount of numbers in a row he nevertheless scores the equivalent of the usual amount of numbers, may increase the odds, or may obtain extra balls. Sometimes the deposit of a dime achieves nothing, and no change takes place,—which is to say that an additional payment does not automatically entitle the player to further odds, or game features, or extra balls,—those are circumstances the player has no control over, as was admitted by more than one of the defendants' witnesses,—that is pure chance. One of the defendants' witnesses said that each time a dime is deposited a change,—completely uncontrolled by the player,—in the electrical system occurs, but at times those changes,—whatever they may be,—occur with, strangely, no visible change on the vertical score board. All game features and odds are represented by appropriate figures illuminated on the score board. For a further example, depositing extra dimes may,—but not necessarily does,—light up a couple of stars at the lower left and right corners of the score board, and, if that occurs, then, if one of the balls thereafter simply rolls over a corresponding spot on the playing field, numbers 8 and 23 will light up, which is equivalent to the ball dropping in the 8 or 23 holes. Whether those stars do or do not light up on the deposit of coins is a circumstance the player has no control over. In fact, other than the First and Second Cards lighting up upon the deposit of the first and second dimes, the player does not know what is going to happen on the back of the machine and cannot control it.

The machine is equipped with a "tilt" device like a plumb bob which renders it inoperative when jolted too hard, voids the game, and disqualifies the player until an additional dime is inserted starting a new play. Various electrical devices are housed immedi-

45

ately behind the score board and they determine the odds and the frequency of occurrence of the added game features, over which the player has not the remotest control. If replays or free games have been won then the player thereafter pushes buttons instead of depositing coins in the playing of the machine. All in all, it is an intricate and attractive piece of machinery.

Does this device fall within the amendatory exception to the Gambling Device statute descriptive of devices which are not to be considered gambling devices and hence not subject to seizure and destruction? In order to come within that exception, the device must be (1) a coin-in-the-slot-operated mechanical device, (2) played for amusement, (3) which rewards the player with the right to replay, (4) which is so constructed or devised as to make the result of the operation thereof depend in part upon the skill of the player, and (5) which returns to the player thereof no coins, tokens, or merchandise.

▮▮▮ Amendatory exceptions and provisos in a statute being designed to qualify or limit what is otherwise generally affirmed in the body of an act, are to be strictly construed, and the burden is on him who says he comes within some statutory exception to establish that he does: Doubler v. Doubler (1952) 412 Ill. 597, 600; State Public Utilities Commission v. Early et al. (1918) 285 Ill. 469. With this in mind, it is axiomatic that all five above conditions are prerequisites to its application, that is, before the amendatory exception can take the instant device out of the statute, all conjunctive conditions must be met, and if any be lacking the device does not come within the amendatory exception. That the machine in question is a coin-in-the-slot-operated mechanical device, and that it does not specifically reward the player with coins, tokens, or

46

merchandise are undisputed. But, while there may be no evidence of the latter, it is, of course, common knowledge that the free game feature, with which it rewards the player, may be and is easily perverted for gambling purposes, and is more often so done than not. Players of these devices generally would not insert dime after dime solely to be amused—they obviously would hope for some pecuniary gain, directly or indirectly. What we stated in People v. One Pinball Machine, supra, bears reiteration:

"While it does not appear from the evidence in this case still it is common knowledge that the so-called free game is frequently but a subterfuge, and that the common practice is for the proprietor, when the player obtains a winning score, to pay off in money or merchandise. It is also common knowledge that the machine itself is sometimes used by players to determine who shall buy the drinks or pay for refreshments, cigars or lunch and when so used it is a gambling device within the meaning of our statute. The fact that there is no testimony in this case that the machine in controversy was being so operated, is not the test of whether it is a gambling device."

Whatever may be our conclusions, however, as to why certain people play pinball machines, whether solely for amusement, or otherwise, their definitive expression is unnecessary here in the view we take of the fourth condition of the amendatory exception which requires that the device must be so constructed or devised as to make the result of the operation thereof depend in part upon the skill of the player.

The defendants strenuously contend that the result does depend in part upon the skill of the player. They would have us hold, in substance, that the phrase "in part," as used in the amendment, can mean something infinitesimal or practically indiscernible.

47

■ That phrase is not fraught with any unusual obscurities and the intent of the Legislature can reasonably be determined.

"In part" according to Webster's New International Dictionary, Second Edition, means "in some degree," "partly." In everyday speech, it means a portion of a whole and something reasonably discernible. It is not a modicum, minimal, or a scintilla of skill that the Legislature had in mind. We do not hold that the phrase necessarily means a predominate part, because a "part" can certainly be less than a half. But, it must be something about which one reasonably can either feel or talk and still not be feeling or talking about nothing or next to nothing.

■ It is fundamental that each word, clause, and sentence in a statute must, if possible, be given some meaning, and be interpreted reasonably: People ex rel. Roan v. Wilson et al. (1950) 405 Ill. 122, 128; Doubler v. Doubler, supra. We cannot assume the Legislature inserted the phrase, "in part," uselessly, or casually. If we accepted the defendants' arguments, we would have to practically ignore this rule, and if "in part" means what they urge as applied to this device then it is of only gossamer quality and the Legislature might as well have deleted the entire phrase or the entire clause. At one point in their briefs the defendants tell us that in every case they have found relating to the operation of a pinball machine the Courts have conceded that the operation involved some skill. That, of course, is much too broad a comment. But, if it were accurate, then, the Legislature being presumed to know the state of the law at the time it adopted the 1953 amendment, not only the phrase "in part" but the whole clause "which device is so constructed or devised as to make such result of the operation thereof depend in part upon the skill of the player" were completely unnecessary as to pinball machines,—they also depend in part on skill, under the defendants' analysis,—and, hence, the whole

48

clause is nothing but a pedantic exercise in mental gymnastics, and wholly pointless as to pinball machines.

Presumably the Legislature acted meaningly, however, intended the phrase and clause to have a sensible, reasonable, practical, substantive meaning, and did not use them lightly. We must, as the defendants suggest, give full recognition to the 1953 amendment, but, in doing so, that means full recognition to all of it, including the portion "which device is so constructed or devised as to make such result of the operation thereof depend in part upon the skill of the player," and construing "in part" reasonably, practicably, and in accordance with what the Legislature must reasonably have intended. We think the Legislature must have had in mind that there are or may be some pinball machines which are so constructed or devised as to not really make their result depend on any real skill of the player, and that there are or may be, on the other hand, some other pinball machines which are so constructed or devised as to really make their result really depend in part on real skill of the player. We do not believe the Legislature was engaging in useless mental gymnastics, or acting pointlessly. Its attempt to categorize or distinguish different types of pinball machines is a matter of substance. It is not chimerical or gossamer in quality.

We, thus, come to a determination as to what the evidence discloses, apropos of this aspect. As we view the evidence, the element of player skill, if any, here is reduced to a minimum, is chimerical, and can not reasonably be equated with the language "in part" as used in the amendment. The amount of skill, if any, here involved is fantastically small, or almost nonexistent, and is not of a reasonable or substantive quality.

Certain witnesses for the defendants claimed that by "gunching" and "hulaing" the machine they could control the ball and "waltz" it between the various pins,

49

bumpers and holes on the playing field to make it go a certain way and achieve a desired result. "Gunching" and "hulaing" are part of the argot or jargon of pinball devotees to describe the act of pushing, pulling, shoving, hitting, shaking, or tipping the machine at what they consider the psychological moment, usually just as the ball hits a bumper, to supposedly influence in some manner the course of the steel ball. One of the defendants' witnesses says the legs on the machine are designed to carry the weight thereof but also allow "springiness" in action and *permit* gunching, though he does not say, and no one else says, the device is *constructed* or *devised* for gunching,—merely that gunching is *permitted,* he says, by the springiness of the legs. Actually, it would appear that "gunching" could occur with or without springiness in the legs,—springiness is not essential to gunching. But whatever so called "skill" may be present in these picturesque acts—and at best it is very small—is nullified by the tilting mechanism. It is hard to see how gunching or hulaing the device can have any appreciable or discernible effect on the course of the ball before the tilting mechanism voids that particular play. And there is apparently no way of knowing how much, if any, "gunching" a particular machine will take before the tilting feature is activated,—it evidently depends somewhat on where the machine is located and the adjustment of the tilting mechanism. A machine apparently may take no, little, a medium amount, or much gunching before the tilt operates,—and, we assume, since the tilt mechanism is subject to adjustment, and that not by the player, a particular machine may vary from time to time as to when it will or will not tilt. And the very fact this machine has the "tilt" device, the only purpose of which is to prevent or discourage "gunching," is strongly persuasive that the machine is not so constructed or devised as to make the result of its opera-

50

tion depend in part upon the skill of the player (assuming that gunching can properly be considered "skill"). If there be "springiness" in the legs of the machine to *permit* gunching then there is an irreconcilable conflict in the physical construction of the machine between that and the tilt device to *prevent* or discourage gunching, and there is no satisfactory explanation thereof by the defendants.

 Moreover, there is no evidence this device is so constructed or devised as to make the result of its operation *depend* in part, or at all, upon so called "gunching" or "hulaing." "Depend," in this respect, means "to be contingent—to require something as a condition—to be conditioned—" and its applicable synonyms are "hinge, hang, turn": Webster's New International Dictionary, Second Ed. This device can be operated very well without any gunching or hulaing. Its operation and result are not contingent thereupon; it does not require such as a condition to its operation; it does not hinge, hang, or turn upon such gunching or hulaing. In fact, except for the picturesque allusions to such practices by some of the defendants' witnesses, —none of whom said gunching or hulaing were indispensable to the operation of the device,—the physical appearance of the device, as well as the other evidence, including the tilt mechanism, would indicate that under normal, orthodox conditions it is supposed to stand still, upright, and the only thing the player is supposed to do is put dimes in, or push buttons, and pull the plunger. One definition of "skill" is "the art of doing a thing as it ought to be done": Bouvier's Law Dictionary, P. 1115. And see: Steely v. Commonwealth, 291 Ky. 554, 164 S.W.2d 977. That the legs may have some "springiness" which may, incidentally, *permit* gunching or hulaing (though not essential thereto) is a far cry from saying the device is *constructed* or *devised* for gunching or hulaing or that its result *depends*

51

at all upon gunching or hulaing. We suppose that almost any game or device, even ping-pong, or checkers, may, if a player be so inclined, be perverted by perhaps striking or moving the playing field or the table or support on which it rests or is played, but we've not heretofore thought such indicated any real "skill" in the player and we do not now think so, and we do not understand that such makes the result of the game's or device's operation *depend* thereon. Hence, so far as gunching or hulaing are concerned as being alleged elements of skill, the device not being *constructed* or *devised* to make its operation *depend* in part (or in any degree at all) upon gunching or hulaing, it therefore does not *depend* in part upon the "skill" of the player.

Nor does the plunger device or its knob or guide plate provide a means of exercising "skill" within the meaning of the amendment. The only thing that one could possibly control by the plunger, by the manner it is pulled back and released, is the probable side of the playing field on which the ball would initiate or begin its downward course. But, as soon as the ball starts down, the bumpers and other impedimenta come immediately into play, bouncing the ball erratically and unpredictably in no predetermined direction, and voiding, for all practical purposes, whatever minimal advantage one might have by the happenstance of the ball's initial position on the left, or right, or center at the top or beginning of the playing field. As one of the defendants' witnesses said, even if a player could start the ball 99 times out of 100 on the side of the playing field which he wished, the effect of whatever control he initially had over the ball would be completely lost (by the impedimenta) if he did not gunch the machine. One of the defendants' witnesses, evidently an experienced devotee, said, in substance, that, by "gunching," the best he could do was direct the ball in a general direction,—he could not release it so it would go in a

particular hole every time,—and, disregarding the "gunching," he had no control over the ball after it leaves the top of the playing field. He also said a player would have to know the exact degree or spot on a bumper which a ball is about to hit before the player could know the exact course the ball would take at the time he gunched the machine, which lightning mathematical computations and predictions are, of course, obviously impossible in the short time it takes for the ball to roll down the field. Another witness for the defendants also said that if a player be "skilled" to some extent,—especially in using the plunger,—his "skill" is reduced by the very fact that the machine is admittedly not a precision machine. Another defendants' witness said that ordinarily he would not be able to control the ball as he sent it out of the gate and down the field,—that was done by accident, fortune, or fate.

A witness for the plaintiff, a police officer, who had played a machine of this type for about a year,—and about 100 times,—and had observed about 200 other individuals play machines similar to it, said, in substance, that he did not see how the player could control the ball on the playing field after it had left the plunger, by hitting, slapping, or striking the machine, and that there is no possible way to strike the machine and thereby direct the ball into a particular hole. Another witness for the plaintiff, another police officer, who had played about 100 games on a machine of this type, had watched 75 to 100 other people play such, and who had both "gunched" it and not "gunched" it when playing, said he did not have any control over the ball, and had no more control by gunching than by not gunching; some times gunching might change the general direction of the ball's downward progress on the playing field, but that was all.

It is apparent that the designer of this machine did everything possible to eliminate the element of player

53

skill, and, in doing so, did remarkably well, for, we think, nothing of any consequence remains except the element of chance. What is more, the player has no control over the selection of odds payable on winning sequences, or added game features. He simply pays his money and takes a chance, and chance is the soul of this device.

Certain witnesses for the defendants testified that, in their opinion, they acquired a certain proficiency after playing the machine a thousand or more times. That, with an habitual player, may possibly be, but, even if true, to the average player the result of its operation is pure chance.

In State ex rel. Dussalt v. Kilburn, 111 Mont. 400, 109 P.2d 1113, 1115, 135 A. L. R. 99, this aspect was commented on as follows:

"While the evidence shows that by long practice a certain amount of skill may be developed, yet we must view the operation and result of the machine as it is played by the mass of the patronizing public, with whom it is purely a game of chance."

And in Baedaro v. Caldwell, 156 Neb. 489, 56 N.W.2d 706 (1953), the Court stated:

"It is true that with practice a player may develop some skill which would aid him in bringing about the successful result of obtaining the right to a replay; but even with such practiced manipulator the chances of success in the playing of the five balls allotted to him are few and far between, and the opportunity for skill to have any appreciable effect on the result of the play is almost completely overshadowed by the element of chance."

Also apropos is a recent federal case, Johnson v. Phinney (C. A. 5th, 1955) 218 F.2d 303. In that case, the Commissioner of Internal Revenue assessed a wagering tax which was paid, and the appellant sued for refund. The issue was whether or not the operation

54

of a so-called pinball machine constituted a lottery. The Court, said at page 307:

"When he begins the play, he can only propel the ball along a designated channel toward pins or holes, the location of which is likewise selected in the manufacture. No doubt, habitual players who have studied a particular machine may attain a degree of proficiency in deciding the force to apply to the ball or in nudging the machine so that the ball is more likely to strike a particular bumper or fall into a particular hole; but even the most skillful player combats predetermined conditions and odds which are completely beyond his judgment and control."

The claim of these witnesses we would attribute not to any real skill actually acquired, but to the ingenuity of the designer in creating a device that, while removing all reasonable substantive elements of skill, gives to some of its devotees a delusion of expertness. In the view we take, the evidence indicates no reasonable substantive element of real skill is involved, its operation does not depend thereupon, the device is, pure and simple, a game of chance, and is, within the meaning of the general statute, a device "for the reception of money on chance" and "upon the action of which money is staked, hazarded, bet, won or lost."

Since the device is not so constructed or devised as to make the result of its operation depend in part upon the skill of the player, within the meaning of the 1953 amendment, the amendatory exception is inapplicable, and therefore the right of free replay is a "valuable thing," as we've heretofore held. Accordingly, the machine is one for the reception of money upon chance or upon the action of which money is staked, within the general statute. The free play feature thus subjects this device to destruction, as required by Section 2 of the Gambling Device statute. As we said in People v. One Pinball Machine, supra, "it (Section 2) does not

55

require that money only be won or lost. Its efficacy is as potent as if it had expressly included the words 'or other valuable thing.' " The Legislature has determined that gambling devices of the kind involved here are against public policy in that they stimulate the gambling propensity through their allure. Because the public good is thought to be better served without such allurements, the Legislature has declared them outlaw. This device does not come within the amendatory exception of 1953.

■ ■ Many of the questions in this case are questions of fact. There were two witnesses for the plaintiff,—Robert P. Cherry and Bernard K. Rice, both police officers,—and there were five witnesses for the defendants,—Robert Breither, an employee of the company maufacturing and selling the machine, and Robert Lannon, Bert R. Nickerson, Michael Komodins, and Raymond G. Moriarity, who are persons who have frequently played the machine or others like it. In addition, as we've said, there was a physical demonstration before the Court of the machine in operation. Under settled principles, the trial court having an opportunity to observe the conduct and demeanor of the witnesses, and to determine their credibility not only from their testimony but from such conduct and demeanor and also from such interest as they had as appears from the evidence, it is primarily the trial court's responsibility to determine where the weight and preponderance of the evidence lies, and, insofar as fact questions are concerned, we should not disturb its conclusion unless contrary to the manifest weight of the evidence. We cannot say here that, insofar as fact questions are concerned, the judgment of the trial court is against the manifest weight of the evidence.

The machine in question, under the circumstances, is a gambling device and comes within the general ban

of the statute. The Circuit Court was correct in ordering its destruction, and its order will be affirmed.

Affirmed.

DOVE, P. J. and EOVALDI, J., concur.